Filed 1/13/26  In re J.H. CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.H. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.H., <br><br> Defendant and Appellant. | F089555 <br><br> (Super. Ct. Nos. 24CEJ300160-4, 24CEJ300160-5) <br><br> **OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Fresno County.  James A. Kelley, Judge.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Douglas T. Sloan, County Counsel, and Ashley N. McGuire, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant, Michael H. (father) is the father of J.H. and Ava H. (the children), who are the subjects of this dependency case. Father challenges the juvenile court's orders issued at a combined jurisdiction and disposition hearing denying him reunification services under Welfare and Institutions Code section 361.5, subdivision (b)(6).[1] Father contends the court's findings under the bypass provision are not supported by substantial evidence. We reject father's contentions and affirm the dispositional orders.

**FACTS**

### *Initial Removal*

On August 26, 2024, the Fresno County Department of Social Services (department) received a referral alleging father had sexually abused the children's eight-year-old half sibling, Ivy B. According to the referral, Ivy disclosed being touched by father " 'where she does not want to be touched.' " Ivy demonstrated where she was touched by running her hands across her breasts, down her stomach, and stopping at her pant line. She then stated, " 'he touches from the top to the bottom.' " The last time Ivy was touched by father was a few days earlier. The child's mother, Alexis C. (mother), continued her relationship with father despite her knowledge of the disclosures made by Ivy.

An investigating social worker, Matthew H., from the department responded to the children's school and met with Fresno Police Department Officer Aaron Saavedra. Saavedra had already interviewed Ivy and her 10-year-old sibling, A.B. Ivy reported father sat down next to her while she was playing video games, and he put his hands on her chest under her clothes. Ivy told her mother about the touching, but mother responded that it was not true.

Saavedra directed Matthew to a room where mother, Ivy, and A.B. were waiting. Matthew introduced himself to Ivy, and he explained his role in the investigation of the

---

[1]     All further statutory references are to the Welfare and Institutions Code.

abuse. Ivy indicated she did not want to speak with Matthew, and she declined an interview. A.B. agreed to being interviewed by Matthew without a staff member or parent present. Matthew determined A.B. could distinguish between the truth and a lie, and she agreed to be truthful when answering his questions.

A.B. denied there was any domestic violence or drug use in the home. She reported witnessing father inappropriately touch Ivy under her clothes on one occasion. A.B. saw father touch Ivy "on the chest down by her privates." She was aware that mother did not believe Ivy's disclosure of the abuse. A.B. denied that father had ever inappropriately touched her. However, she was afraid of father because he would hit, curse, and yell at her and her siblings. A.B. indicated that her mother was not able to protect them, but she felt safe with her maternal aunt, Monique C.

The children's 15-year-old half brother, Xavier B., denied receiving or witnessing any inappropriate touching by father during his interview with the social worker. Xavier stated father used cocaine, but he had not observed father use any drugs. He did not feel safe in the home with father present.

Mother acknowledged that Ivy informed her of the inappropriate touching approximately one month earlier. Ivy reportedly told her that father touched her on her breast, but mother claimed father stopped above her "privates." Mother indicated Ivy was not comfortable around father, and she believed Ivy's reporting. However, she did not call law enforcement when Ivy informed her of the abuse, and she had not spoken to father about the allegations. Ivy told mother the abuse occurred while mother was at work. Mother was willing to leave father and go to her sister's home to help keep her children safe.

A safety plan was made by Saavedra to allow the children to stay at their aunt Monique's home without placing them into protective custody. Xavier, A.B., and

Ivy (collectively, "the siblings") were allowed to remain at Monique's home.[2] Matthew observed Monique's home to be clean and meet minimal standards. Monique agreed to do everything in her power to keep the children and siblings safe.

On September 6, 2024, Matthew contacted father by phone. Father denied touching Ivy in an inappropriate way. He stated the children's siblings wanted to be at their aunt's home because they did not like the rules in mother's home. Father indicated that he wanted the children and mother back at home with him. He denied any use of physical discipline or drugs.

Ivy and A.B. participated in a forensic interview on September 24, 2024. Ivy stated father would push her and punch A.B., but father was not abusive toward the children. She also described an incident where father punched mother's lip and forehead. Ivy indicated father made her drink alcohol on her eighth birthday.

The forensic interviewer went over body parts with Ivy. Ivy identified her " 'boobs' " as one of her body parts, and she stated father touched them on more than one occasion. Ivy described her vagina as the body part that she uses to "pee." She stated father had touched her vagina more than once, and she denied that anyone had touched her "butt." Ivy indicated the first incident happened when she was eight years old. She was sitting on the couch at her home when father sat down next to her. Father began rubbing her "boobs" with his hand, and he placed his hand inside her clothes to touch them.

Ivy stated father proceeded to rub her vagina with his hand, and he eventually placed his hand inside of her underwear. She described his hand moving from side to side inside of her vagina. The touching made Ivy feel uncomfortable. Ivy told father to stop, and he punched her in the stomach. She threw up, ran into her room, and locked her

---

[2] The siblings are the children of mother and her former spouse, who are not parties to this appeal.

bedroom door.  Mother was at work during this incident, and A.B. was in their bedroom. Ivy wanted father to "go away" from mother, and she did not feel safe with him in the home.  She denied anyone told her what to say prior to the interview, and she did not tell any lies during the interview.

A.B. was interviewed separately from Ivy.  A.B. was able to distinguish between the truth and a lie, and she agreed to be truthful when answering questions.  Father was described as abusive by A.B.  Father reportedly threatened to kill Xavier when he was older.  A.B. recalled an incident where father covered her mouth until she threw up.  She indicated that Ivy and she took care of the children while father watched television on the couch.  A.B. also claimed mother and father fought "over and over again."

A.B. stated she was nine years old when she saw father inappropriately touch Ivy. She witnessed father touch Ivy's nipples while he said, " 'Oh you have skinny nipples.' " She recalled Ivy wearing a pink shirt on the date of the incident.  Father had his hand under Ivy's shirt, and Ivy was looking at her for help.  A.B. did not do anything because she believed father would beat her.  Ivy and A.B. both told mother about the incident, but mother told them father would never do that.  A.B. did not believe mother would leave father, and she felt safer at her aunt's home.  Ivy told A.B. that father touched her "down there where you pee."  A.B. denied father ever touched her inappropriately.

The children and their siblings were taken into protective custody after the forensic interviews were completed.  On September 26, 2024, the department filed an original petition alleging the children and their siblings were described by section 300, subdivisions (b)(1) and (d).  The petition alleged that the children and siblings were at substantial risk of suffering serious physical harm due to ongoing domestic violence between mother and father.  The petition further alleged the children and siblings were at substantial risk of suffering sexual abuse by father due to the sexual abuse inflicted on Ivy.  Another allegation stated the children were at risk of suffering nonaccidental harm by father pursuant to section 300, subdivision (a).

5.

At the detention hearing held on September 30, 2024, the juvenile court ordered that the children be detained from mother and father's custody, and a jurisdiction and disposition hearing was set for October 28, 2024.

*Jurisdiction and Disposition*

The department's jurisdiction and disposition report, dated October 23, 2024, recommended that the allegations in the original petition be found true and disposition be continued for a full assessment. The children were placed with their paternal grandmother, and the siblings were placed with their maternal aunt Monique. Two-year-old J.H. and one-year-old Ava were both developing in an age-appropriate manner with no significant medical issues. Supervised visits between father and the children occurred each Tuesday and Wednesday for one hour. Mother and father participated in joint visits with the children each Friday, and there were no concerns reported during those visits.

In October 2024, the newly assigned social worker met with both parents separately for an initial interview. Mother stated she was informed that Ivy was touched in an "uncomfortable" way approximately two months earlier. Mother believed Ivy felt "uncomfortable" because father was not her biological father. Mother acknowledged suffering sexual abuse as a child herself, but she did not believe Ivy was sexually abused by father. Mother claimed Ivy had a tendency to lie, and she reportedly found Ivy watching pornography on her phone. The siblings' reports of domestic violence were initially described as " 'disagreements' " by mother. However, she did acknowledge that arguments with father would result in her staying at the aunt's home on occasion.

In father's interview with the social worker, he indicated mother left the home for almost a week due to their arguments. Father claimed he would never touch Ivy because he had been in her life since she was three years old. Mother and father had been in a relationship since 2019, and they married in 2022. He began crying and shaking after the social worker informed him that he could be denied family reunification services. Father

expressed his willingness to participate in services to reunify with all of mother's children. He acknowledged having an extensive criminal history that consisted of gun charges, dissuading a witness, and other convictions. Father admitted to making many mistakes in his life, but he wanted to be a better parent.

Both parents were referred to a parenting program, substance abuse assessment, domestic violence assessment, and mental health assessment. Father consistently tested negative for all substances in September and October 2024.

The report detailed father's criminal history, which included arrests and charges for inflicting corporal injury on a spouse, child endangerment, criminal threats, obstructing a public officer, battery causing serious bodily injury, assault with a deadly weapon, possession of a firearm by a felon or narcotic drug user, possession of a controlled substance for sales, dissuading a victim from testifying, battery of a non-cohabitant, concealed weapon in vehicle, carrying a loaded firearm in a public place, possession of a controlled substance, possession of paraphernalia, and false imprisonment with violence.

The initial hearing on jurisdiction and disposition was continued due to mother and father's request for a contested hearing. The department submitted an addendum report, dated November 22, 2024, which recommended family reunification services be provided to mother and denied for father pursuant to section 361.5, subdivision (b)(6). The report specified that section 361.5, subdivision (b)(6) was applicable to father due to his infliction of severe sexual abuse on Ivy. The severe sexual abuse consisted of father placing his hands under Ivy's shirt to touch her breasts, and father had also moved his hands inside of her vagina. The report also discussed the factors relevant to a court's determination that reunification services would not benefit the children, and the department concluded the children would not benefit from reunification services for father.

On November 6, 2024, Monique informed the social worker that mother came to her home with the children and siblings in August 2024. Mother was under the influence of alcohol and cocaine at the time. She told Monique that father was abusing the children and siblings. Ivy started to share about the abuse, but mother attempted to discourage Ivy from discussing the abuse. Ivy continued to disclose how father was touching her inappropriately while all of Monique's family and mother's family were present. Monique indicated mother was in denial because she did not believe any of the abuse occurred.

A meeting was held on November 20, 2024, to review the appropriateness of providing family reunification services to mother. Mother indicated that she would separate from father if the allegations in the petition were found true. However, she did not believe the allegations were true. The department advised mother to continue participating in the services offered. It was determined mother did not meet the criteria for denial of services pursuant to section 361.5, subdivision (b)(6). The department was concerned about father's ability to benefit from services due to the severity of the reported abuse. Thus, the department did not believe that providing family reunification services to father would be in the children's best interest.

A second addendum report was submitted by the department on February 27, 2025. At the time of the report, father was participating in a parenting program, child abuse intervention program, sex offender treatment program, and mental health services. Father did not meet the medical necessities for substance abuse treatment. He continued to test negative for all substances during his random drug testing.

The children's placement changed to the paternal uncle's home, which allowed father to have his visits supervised by the uncle for approximately one month. However, the paternal uncle refused to facilitate the visits due to father's failure to respect the uncle's home and family rules. The paternal uncle's wife became uncomfortable with the way father was speaking and acting during visits. Father was arrested in January 2025 on

8.

a charge of oral copulation or sexual penetration of a child who is 10 years of age or younger. He was bonded out, and a pre-preliminary hearing was set in April 2025.

The siblings each provided statements to the department regarding potential reunification with mother. Xavier stated he did not want to reunify with mother because she continued to choose father over her three oldest children. A.B. indicated father was "awful," and she wanted mother to leave him. A.B. stated father hit mother in front of her and her siblings, and there was nothing mother could do to convince her to return home if she remained in a relationship with father. Xaiver and A.B. wanted mother to waive her family reunification services to allow them to remain with the maternal aunt. !(CT 554)! Ivy was hopeful that she could reunify with mother, but she did not want to return to mother if she was not willing to leave father.

### Contested Hearing

The contested jurisdiction and disposition hearing began on March 18, 2025. Mother and father were present and represented by counsel. The parties stipulated to the admission of two videos and their accompanying audio transcriptions into evidence. The bodycam footage from Saavedra's response to the school on August 26, 2024 was played first. The video from the forensic interviews of Ivy and A.B. was played on the following day.

#### Officer Saavedra's Testimony

Saavedra testified that he was dispatched to A.B. and Ivy's school on August 26, 2024. School staff told Saavedra that two students disclosed inappropriate touching to their teacher at lunch time. A teacher explained the students were afraid to go home after school. A.B. and Ivy were supposed to return to the care of mother and father from their aunt's home after school. Ivy reported father would sit next to her and touch her inappropriately in her groin area.

Saavedra believed there were conflicting reports of the abuse happening either a few days earlier or prior to father's arrest for domestic violence. Ivy was asked where

9.

A.B. was during the most recent incident of inappropriate touching, and she stated that A.B. was in her bedroom. Saavedra was unable to ask her anymore questions because she did not appear to be interested in further questions. Saavedra testified that he did not substantiate a crime because the incidents occurred a few months earlier and there were only two witnesses. He also believed the witnesses stories were not "[100] percent" consistent due to Ivy's statement that A.B. was in the other room and A.B.'s statement that she witnessed the inappropriate touching.

*Officer Coleman's Testimony*

Officer Kyle Coleman testified regarding the response to a domestic disturbance involving father and mother in February 2024. Coleman spoke to each of the siblings upon arrival. Mother had driven the children and siblings to their aunt's home after the incident. A.B. reported witnessing father hit mother in the face approximately five times. Coleman also recalled father cursed at mother and discussed killing her family. A.B. told Coleman that father made her drink alcohol on her birthday. Ivy indicated she witnessed the physical altercation between mother and father and heard father make a comment about killing mother's family.

*Officer Zamora's Testimony*

Officer Melvin Zamora responded to the same domestic violence incident in February 2024. Zamora obtained statements from mother and father in relation to the incident. Mother stated she got into a verbal argument with father about his football team. Mother claimed she lost her balance after father shoved her, and she hit her head on the refrigerator. Father acknowledged that there was an argument between mother and him, but he denied knowing how mother sustained a bump on her forehead. Zamora placed father under arrest. Mother refused the emergency protective order, and she did not want to press charges against father.

*Forensic Interviewer's Testimony*

The individual who conducted the forensic interviews of Ivy and A.B., Caroline D., testified regarding her interview process. Caroline testified that her job is to create a safe setting where a child can give his or her statement. She interviewed over 4,000 children in the past 11 years in her position. Caroline described Ivy and A.B.'s ability to provide details in a narrative as below average. Both would state that there was abuse, and they could describe one occasion. However, they would not be able to describe additional events.

Ivy described being touched more than once, but she only provided detail for one of the incidents. Caroline was uncertain if A.B. discussed her observation of a different incident than the one described by Ivy. Caroline attempted to have Ivy provide details for the other incident of sexual abuse, but Ivy was unable to provide a narrative. Ivy appeared to be closed off during the forensic interview, and her narrative became short when she was asked about the sexual abuse. Caroline explained that this was normal for children who experienced abuse.

*Social Workers' Testimony*

The family reunification social worker, Kaitlyn I., testified that the case was assigned to her in November 2024. Kaitlyn believed mother provided inconsistent information that raised questions about her ability to protect the children and siblings. Mother did not believe the allegations made by the siblings because she felt they had lied to her before. The investigating social worker, Matthew H., testified regarding his observations on the date of the department's initial response to the referral on August 26, 2024.

*Father's Testimony*

Father testified that he would take the children to the park for barbecues when they lived together. He attended their medical appointments and parent-teacher conferences at school. Father testified that Ivy once claimed a teacher hit her with a ruler, but she

11.

eventually admitted that it did not happen. He stated Ivy and A.B. both struggled in school with poor grades, and there were meetings with the school to address Ivy's truancy. Father testified that Ivy had also lied about mother texting another man and a boy breaking her cellphone. The children had not lived with father since mother left the home in the first week of August 2024. Father testified there had been no physical altercations between himself and mother, and he denied that he ever shoved mother.

*Argument and Ruling*

Counsel for the department and children argued in support of the recommendation to sustain the petition and deny family reunification services to father pursuant to section 361.5, subdivision (b)(6). Father's counsel argued the evidence did not support the jurisdictional allegations, and he requested that family reunification services be provided for father in the event jurisdiction was taken by the court.

After hearing argument from counsel, the juvenile court found the allegations in the original petition true except for a withdrawn allegation that father had a substance abuse problem with cocaine and alcohol. The court also found there was clear and convincing evidence the children were adjudicated dependents as a result of severe sexual abuse to their sibling pursuant to section 361.5, subdivision (b)(6) and it would not benefit the children to pursue reunification with father. Family reunification services were ordered to be provided to mother and denied to father. A six-month review hearing was set for September 10, 2025.

At the conclusion of the juvenile court's ruling and recitation of findings and orders, the court asked the parties for further comment. The department's counsel responded that section 361.5, subdivision (k) states "the Court must state on the record the basis for the finding of the severe sexual abuse and specify the factual findings used to determine that providing reunification services to the offending parent would not benefit the child."

In response, the juvenile court stated, "The Court makes a finding based on witness testimony." The court proceeded to ask the remaining parties if there were any further comments, and father's counsel made no additional comment or argument. Father filed a timely notice of appeal on March 25, 2025.

## DISCUSSION

Father contends that the juvenile court's dispositional order denying him family reunification services should be reversed. He argues that the court's bypass finding pursuant to section 361.5, subdivision (b)(6) was not supported by substantial evidence.

### A.    Applicable Law

As a general rule, when a child is removed from parental custody under the dependency laws, the juvenile court is required to provide reunification services to "the child and the child's mother and statutorily presumed father" (§ 361.5, subd. (a)). However, it is also the "intent of the Legislature, especially with regard to young children, … that the dependency process proceed with deliberate speed and without undue delay." (*Marlene M. v. Superior Court* (2000) 80 Cal.App.4th 1139, 1151.) Thus, the statutory scheme recognizes that there are cases in which the delay attributable to the provision of reunification services would be more detrimental to the minor than discounting the competing goal of family preservation. (*Ibid*.) Specifically, section 361.5, subdivision (b) exempts from reunification services " 'those parents who are unlikely to benefit' " from such services or for whom reunification efforts are likely to be " 'fruitless.' " (*In re Joshua M.* (1998) 66 Cal.App.4th 458, 470, 474.)

The statutory sections authorizing denial of reunification services are sometimes referred to as "bypass" provisions. (*Melissa R. v. Superior Court* (2012) 207 Cal.App.4th 816, 821.) Under section 361.5, subdivision (b)(6), the court may issue a bypass order if it finds by clear and convincing evidence that a dependent child has been so adjudicated "as a result of severe sexual abuse … to the child, a sibling, or a half sibling by a parent

or guardian, … and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian."

The term "severe sexual abuse" in the statute "is defined very broadly." (Cal. Juvenile Dependency Practice (Cont.Ed.Bar 1st ed. 2015) § 5.57, p. 370.) Section 361.5, subdivision (b)(6)(B), provides: "A finding of severe sexual abuse, for the purposes of this subdivision, may be based on, but is not limited to, sexual intercourse, or stimulation involving genital-genital, oral-genital, anal-genital, or oral-anal contact … or the penetration or manipulation of the child's, sibling's, or half sibling's genital organs or rectum by any animate or inanimate object for the sexual gratification of the parent or guardian .…"

## B. Standard of Review

On a challenge to the juvenile court's denial of reunification services, we apply the substantial evidence standard. We do so bearing in mind that the court's decision must be supported by clear and convincing evidence. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.) "In so doing, we presume 'in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order.' " (*In re G.L.* (2014) 222 Cal.App.4th 1153, 1164) Our role is not to reweigh the evidence or to make credibility determinations. (*A.A. v. Superior Court* (2012) 209 Cal.App.4th 237, 242.)

## C. Analysis

First, father asserts the juvenile court failed to comply with section 361.5, subdivision (k). !(AOB 33-34)! In determining whether it would benefit the children to pursue reunification services with an offending parent pursuant to section 361.5, subdivision (b)(6), the court "shall consider any information it deems relevant, including the following factors:" (1) "The specific act or omission comprising the severe sexual abuse"; (2) "The circumstances under which the abuse … was inflicted"; (3) "The

14.

severity of the emotional trauma suffered by the child"; (4) "Any history of abuse of other children by the offending parent "; (5) "The likelihood that the child may be safely returned to the care of the offending parent … within 12 months with no continuing supervision"; and (6) "Whether or not the child desires to be reunified with the offending parent .…" (§ 361.5, subd. (i).) If the court decides to bypass services, it must "read into the record the basis for a finding of severe sexual abuse … under paragraph (6) of subdivision (b), and shall also specify the factual findings used to determine that the provision of reunification services to the offending parent … would not benefit the child." (§ 361.5, subd. (k).)

In response to the department's request to specify the factual basis for its findings under section 361.5, subdivision (b)(6), the juvenile court identified the testimony introduced at the contested hearing as the basis. The testimony comprised the observations of multiple witnesses who were informed of Ivy's disclosures of sexual abuse. Both Saavedra and Caroline directly interviewed Ivy, and their testimony highlighted the sexual abuse reported by Ivy. The department's reports only identified the sexual abuse of Ivy as the basis for its determination that father should be denied family reunification services pursuant to section 361.5, subdivision (b)(6).

Father is correct that the juvenile court did not set forth the factual findings for its determination that reunification services would not benefit the children. However, the department addressed the relevant factors in its first addendum report. Father offers no persuasive argument as to why any alleged deficiency in the court's explanation of the basis for its decision should, on its own, be considered reversible error. (See *In re S.G.* (2003) 112 Cal.App.4th 1254, 1260 [rejecting argument that failure to make specific factual findings necessary for a denial of services under section 361.5, subdivision (b)(6) "mandates reversal"].) Here, as is normally the case on appeal, we infer any findings necessary to support the juvenile court's decision, to the extent those implied findings are supported by substantial evidence. (See *S.G.*, at p. 1260.)

In the present case, there was evidence that while Ivy was sitting on the couch, father sat next to her and placed his hands under her shirt. Ivy explained that this occurred on more than one occasion, and A.B. reported witnessing father touch Ivy in this manner during one of those instances. Ivy also described father placing his hands underneath her underwear and moving his hand from side to side inside of her vagina. These statements constituted substantial evidence of severe sexual abuse. Although Ivy was unable to provide more details regarding the specific dates, times, and occurrences of the abuse, the forensic interviewer testified that this was normal for abused children. Accordingly, the juvenile court could reasonably attribute the lack of specific details to her young age and suffering of significant trauma.

Father argues the conduct described by Ivy did not constitute severe sexual abuse. If the statute defined "severe sexual abuse" narrowly as including only the acts therein specified, father's argument might have some weight. However, section 361.5(b)(6) provides that a court's finding of severe sexual abuse "may be based on, but is not limited to," the specified acts set forth therein. Father's action of placing his hands on Ivy's bare breasts along with inserting his hands inside of her vagina on more than one occasion constituted severe sexual abuse. Specifically, the penetration of the vagina by father's fingers is either comparable or directly described by the action of "manipulation of the child's … genital organs or rectum by an animate or inanimate object." (§ 361.5, subd. (b)(6)(B).)

In considering whether the provision of reunification services would benefit the children in cases where the circumstances of section 361.5, subdivision (b)(6)(B) apply, the juvenile court must consider any information it deems relevant, including the specific act constituting the severe sexual abuse inflicted, the circumstances of the infliction of the abuse, the severity of the emotional trauma suffered by the child victim, any history of child abuse by the parent, the likelihood of safely reunifying with no supervision within

16.

12 months, and the desires of the child regarding reunification with the parent.  (§ 361.5, subd. (i).)

On this record, there was ample evidence to support the juvenile court's bypass determination.  Father inflicted severe sexual abuse on Ivy on more than one occasion, which consisted of touching her bare breasts and placing his fingers inside of her vagina.  Ivy was eight years old at the time of the first incident, and father punched her in the stomach when she asked him to stop.  The children were too young to make a statement regarding their position on reunification with father, but none of their older siblings wanted to return to mother's care unless she separated from father.

Father's purported bond with the children, who were removed at two years old and one year old, is not as compelling as the real risk that would be posed to the children if returned to father's care.  Although father cites to the fact that the children were not suffering from any emotional or developmental issues or harboring negative emotions toward father, this does not render the court's decision arbitrary or capricious.  While it does appear the children enjoyed visiting with father and he had participated in predisposition services, when weighed against the other factors, the court could still reasonably conclude the children would not benefit from father receiving reunification services.

Despite father's efforts, there was still a "very real concern for the risk of recidivism."  (*Deborah S. v. Superior Court* (1996) 43 Cal.App.4th 741, 751.)  "[A]n abusive parent's risk of recidivism is not necessarily limited to a child who was the parent's previous victim.  The parent may very well pose a serious threat to his or her other children.  The Legislature appears to have recognized this sad circumstance in its drafting of section 361.5, subdivision (b)(6)."  (*Deborah S.*, at p. 751.)  The overwhelming evidence provided by the department regarding the sexual abuse suffered by Ivy was more than sufficient for the juvenile court to conclude that failure to reunify would not be detrimental to the children.

17.

In sum, we presume that the juvenile court considered all the relevant factors.  To the extent there was error in the court's failure to make any particular express finding, father has failed to demonstrate any prejudice.  For these reasons, we conclude the court did not err by denying father reunification services.

## DISPOSITION

The juvenile court's orders are affirmed.

PEÑA, J.

WE CONCUR:

DETJEN, Acting P. J.

FRANSON, J.